BWB:MTK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK **15 MISC 2539**
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
IN THE MATTER OF AN APPLICATION OF  :
THE UNITED STATES OF AMERICA FOR AN  :    **TO BE FILED UNDER SEAL**
ORDER AUTHORIZING THE DISCLOSURE  :
OF LOCATION DATA AND THE USE OF A  :    AFFIDAVIT IN SUPPORT OF
PEN REGISTER AND TRAP AND TRACE  :    WARRANT APPLICATION
DEVICE RELATING TO A SPECIFIED
WIRELESS TELEPHONE
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

    I, Gino X. Izzo, being first duly sworn, hereby depose and state as follows:

    1.    I make this affidavit in support of an application for a search warrant

under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for

information about the prospective location of (347) 209-3108 (the "SUBJECT

TELEPHONE"), which is being used by a target subject of an investigation, believed to be

ANTHONY DALBA, and whose wireless telephone service provider is T-Mobile USA, Inc.

("Service Provider").  The SUBJECT TELEPHONE is described herein and in Attachment

A, and the prospective location information to be seized is described herein and in

Attachment B.  The government also requests an Order pursuant to 18 U.S.C. §§ 3122 and

3123, authorizing for a period of 60 days the installation and use of a pen register and a trap

and trace device on the SUBJECT TELEPHONE.

    2.    I have been a Task Force Officer with the Drug Enforcement

Administration (the "Investigating Agency") since July 2009.  I have been assigned to

investigate violations of criminal law relating to narcotics trafficking.  These investigations

are conducted both in an undercover and overt capacity. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other Task Force Officers, agents and witnesses. Because the purpose of this affidavit is limited to demonstrating probable cause for the requested warrant, it does not set forth all of my knowledge about this matter. In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

4.      For the reasons set forth below, I respectfully submit that probable cause exists to believe that the requested information will lead to evidence of the crime(s) of distribution and possession with the intent to distribute controlled substances in violation of Title 21, United States Code, Section 841 and conspiracy to do the same in violation of Title 21, United States Code Section 846 (the "Subject Offenses"), as well as the identification and location(s) of the TARGET SUBJECT who is engaged in the Subject Offenses.

## FACTS ESTABLISHING PROBABLE CAUSE

5.      I have been involved in an investigation regarding the distribution of Oxycodone and Acetyl Fentanyl tablets in the metropolitan New York and New Jersey areas.

6.      In connection with that investigation, since on or about June 1, 2015, Task Force Officers have spoken with an individual who is a confidential source ("CS-1")

for law enforcement. CS-1 has worked with the DEA since approximately January 2015 and provided reliable information in the past seven months.[1]

7.    CS-1 knows a target of the investigation, MICHAEL GIBBARD, to be a narcotics dealer. On or about June 8, 2015, CS-1 informed Task Force Officers that he/she had recently spoken with an individual known to GIBBARD at a gym in Queens, New York. During their conversation, the individual known to GIBBARD informed CS-1 that GIBBARD was in possession of approximately 6,000 pills of Oxycodone.

8.    On or about June 11, 2015, CS-1 positively identified GIBBARD in a photo array.

9.    On or about June 29, 2015, CS-1 spoke with GIBBARD at the aforementioned gym in Queens, New York. GIBBARD asked CS-1 if he/she had any interest in purchasing Oxycodone pills. CS-1 stated that he/she was interested in purchasing the pills. GIBBARD informed CS-1 that he would provide CS-1 with a sample the next time they encountered each other at the gym.

10.    GIBBARD informed CS-1 that he purchases the pills in large quantities from a supplier. GIBBARD also informed CS-1 that he could have more pills "pressed" once his supply was exhausted. GIBBARD informed CS-1 that he resupplies his stock of pills with his supplier biweekly.

---

[1] In January 2015, CS-1 plead guilty to a narcotics offense in Essex County, New Jersey. His sentencing is being held in abeyance throughout the duration of his cooperation with the DEA. CS-1 is working with the DEA in an effort to receive a reduced sentence for this offense. In 2003, CS-1 was previously convicted of Assault in the 3rd Degree in violation of New York Penal Law 120.00.

11.     On or about July 6, 2015, CS-1 informed Task Force Officers that he/she had met GIBBARD at the gym earlier in the day.  At that time, GIBBARD provided CS-1 with a sample of two pills.  Task Force Officers arranged to meet CS-1 to collect the samples.

12.     The pills collected from CS-1 contained the marking "A/215" pressed on one side.  Task Force Officers immediately sent the sample pills to the Northeast Regional Laboratory ("NERL") for chemical testing.

13.     On July 9, 2015, NERL verbally informed Task Force Officers that the sample pills were not Oxycodone but rather Acetyl Fentanyl.

14.     On July 13, 2015 Task Force Officers received the official NERL report confirming that the pills contained Acetyl Fentanyl.  According to NERL, Acetyl Fentanyl is a Schedule I narcotic.  It is an extremely powerful opioid used in medical treatment.  Acetyl Fentanyl is approximately 30 to 50 times more potent than heroin.

15.     On or about July 23, 2015, members of the DEA Tactical Diversion Squad conducted surveillance of a meeting between CS-1 and GIBBARD at the Club Fitness Gym ("Gym") located in Astoria, New York.  Prior to the meeting, Task Force Officers equipped CS-1 with an audio/video recording device.  The meeting had been arranged by CS-1 to discuss the potential sale of additional pills to CS-1.  At the meeting, GIBBARD agreed to sell 1,000 pills to CS-1 at a date to be determined.

16.     On or about August 12, 2015 and upon the direction of Task Force Officers, CS-1 conducted a control buy of 500 pills from GIBBARD through an intermediary

4

known to both CS-1 and GIBBARD.  GIBBARD had previously informed CS-1 that the

pills would be provided on consignment.  CS-1 would provide the GIBBARD with

$3,500.00 at a date to be determined.

17.     At the same meeting, GIBBARD also informed CS-1 that he recently

had in his possession as many as 9,000 pills of 30mg Oxycodone.  GIBBARD informed CS-

1 that 2,000 pills were to be sold that same night to another buyer.

18.     On or about August 19, 2015, CS-1 met GIBBARD and provided him

with $3,500.00.

19.     On or about September 21, 2015, Task Force Officers approached the

intermediary known to both GIBBARD and CS-1 who participated in the August 12, 2015

controlled buy.  Task Force Officers informed CS-2 that they had probable cause to arrest

him/her on the basis of the 500 pill narcotics transaction described in paragraph 19.  CS-2

agreed to cooperate with Task Force Officers and was subsequently signed up by the DEA as

a confidential source (hereinafter "CS-2").   CS-2 expects that Task Force Officers will

provide prosecutors information regarding his/her cooperation. [2]

20.     CS-2 has made consensually monitored phone calls with GIBBARD

and has provided Task Force Officers with text messages received from GIBBARD.

21.     For example, on or about September 28, 2015, CS-2 made a

consensually monitored telephone call to GIBBARD which Task Force Officers recorded.

The following is a transcript of the pertinent excerpts of the call:

---

[2] CS-2 has previously been convicted in District Court, Nassau County, New
York of conspiracy to commit a class B felony, to wit: Criminal Possession of a Controlled
Substance in the 4th Degree, in violation of New York Penal Law 105.10.

CS-2:        So, yo, what's going on everyone's waiting for you?

GIBBARD:   What happened?

CS-2:        I said, were, I'm waiting for you what's the story?

GIBBARD:   I saw my friend, when was it?  Saturday

CS-2:        yeah

GIBBARD:   He's like, so, he like, still works that kid, he's got a real job, he makes
             fucking $5,000 dollars a week, He makes $5,000 dollars a week,
             legitimately.  He U/I; you know what I'm saying, he's an electrician,
             local 3, you know what I'm saying?

CS-2:        oh ok

GIBBARD:   So, it's like, It's like that, but it's like when its time its time, so you
             know what I'm saying, he can only do it at certain times.

CS-2:        oh, alright

CS-2:        What I'm saying is if it's an issue for him to get it going that many,
             like, I can break it up, you know what I'm saying?  It doesn't have to
             be in one shot, I would like it to be so I can get it over with, you know
             what I mean?

GIBBARD:   I got you, I'm backed, I'm backed up, for, I'm backed up at least, how
             about this…I'm backed up three blocks.

CS-2:        Wow

GIBBARD:   okay

CS-2:        god, god bless you.

GIBBARD:   no joke I'm backed up three; I'm backed up three blocks.

GIBBARD:   god bless you

GIBBARD:   seriously

CS-2:   that's crazy, unbelievable.  I didn't think that thing was going to go.

GIBBARD:   no, I'm backed up that much.  Three blocks.

CS-2:   alright, well as soon as ugh, you know, the traffic opens up, you know, just, I'll come right to you, just call me whenever.  Even if, like I said, even if it's not that, you know,  cause I know when you spoke to you know who, he wanted to,  you know, tell you, you know, it is what it is, you know?

GIBBARD:   yup

CS-2:   so even if its half, or a quarter, or whatever, I'll just, just let me know. I'll come right over.

GIBBARD:    you got it

CS-2:   alright brother be good, I'll talk to you soon

GIBBARD:   alright, bye

22.     CS-2 informed Task Force Officers that he/she understood GIBBARD's reference to his "friend" to be the individual who manufactures the Acetyl Fentanyl pills that GIBBARD distributes.   CS-2 also understood GIBBARD's statement that he was "backed up three blocks" to mean that GIBBARD owed pills to three other individuals before he could supply CS-2.

23.     On or about October 15, 2015, GIBBARD called CS-2 from a cellular telephone assigned number (347) 223-3851.  GIBBARD had previously informed CS-2 that this was this number was to be utilized for narcotics trafficking (the "First Burner Phone"). GIBBARD informed CS-2 that pills had become available for CS-1 to purchase.  As with the

other controlled buys, GIBBARD would only conduct the transaction using CS-2 as an intermediary.

24.     That same day, at the direction of Task Force Officers, CS-2 arrived at GIBBARD's residence and was provided with 2,200 pills. CS-2 stated that he/she was interested in purchasing 5,000 pills, to which GIBBARD replied, in sum and substance, that he would look into the availability of additional pills. CS-2 informed GIBBARD that he/she would return shortly with CS-1's purchase money. Task Force Officers supplied CS-2 with $13,500.00 which he/she delivered to GIBBARD later that evening.

25.     On or about October 16, 2015, at the direction of Task Force Officers, CS-2 made a consensually recorded telephone call to GIBBARD on the First Burner Phone and inquired about the availability of additional pills. GIBBARD stated, in sum and substance, that he would call his supplier to discuss a resupply of pills and get back to CS-2.

26.     On October 20, 2015, GIBBARD used the First Burner Phone to call CS-2 to inform him/her that he could provide approximately 2,000 more pills for purchase. That same day, at the direction of Task Force Officers, CS-2 made a consensually recorded telephone call to GIBBARD and agreed to the purchase.

27.     Prior to arriving at GIBBARD's residence, Task Force Officers equipped CS-2 with an audio/video recording device. At the meeting, GIBBARD provided CS-2 with 1,978 pills in exchange for $13,660.00 of funds supplied to CS-2 by the DEA.

28.     CS-2 informed Task Force Officers that during the approximately 25 minute meeting, CS-2 asked GIBBARD to confirm the exact quantity of pills that he/she was

8

receiving. CS-2 informed Task Force Officers that GIBBARD used the First Burner Phone

to text his supplier with this inquiry. A short time later, GIBBARD received a telephone call

on the First Burner Phone from the supplier who stated, in sum and substance, that the bag

contained 2,150 pills. CS-2 informed Task Force Officers that these statements were audible

to him/her. A review of CS-2's audio/video recording device confirms this account.

29.    A review of GIBBARD's toll records for the First Burner Phone during

the time interval of the meeting revealed that GIBBARD received a call from cellular

telephone number (929) 247-7890. A further review of GIBBARD's toll records revealed

that as of October 28, 2015, GIBBARD had communicated on the First Burner Phone with

this telephone number approximately 226 times since October 11, 2015.

30.    On October 22, 2015, the Honorable Ramon E. Reyes, Jr. authorized a

search warrant requiring the Service Provider to provide prospective location data with

respect to cellular telephone number (929) 247-7890.

31.    Location data with respect to (929) 247-7890 revealed that the cellular

telephone was predominantly located at 142-25 59th Avenue, Flushing, New York. A review

Lexis-Nexis and TLO records revealed that ANTHONY DALBA resides at that location

with his father.

32.    A review of DALBA's U.S. passport application has revealed that

DALBA listed "electrician" as his employment. Additionally, surveillance on DALBA has

revealed that he is currently employed in Queens at a New York City Department of

Sanitation building worksite. Task Force Officers have observed DALBA wearing an

9

electrician's union sweatshirt and entering a trailer on the worksite that appears to be associated with contractors performing electrical work on the building.

33.     As discussed in paragraph 24, on September 28, 2015, CS-2 made a consensually monitored phone call to GIBBARD. Therein, GIBBARD stated that his supplier was a union electrician:

GIBBARD:   He's like, so, he like, still works that kid, he's got a real job, he makes fucking $5,000 dollars a week, He makes $5,000 dollars a week, legitimately. He U/I; you know what I'm saying, he's an electrician, local 3, you know what I'm saying?

34.     On October 21, 2015, GIBBARD used the First Burner Phone to call CS-2. The call was consensually recorded by CS-2. The conversation proceeded as follows:

GIBBARD:   Yeah, I dropped the phone I'm sorry, fucking piece of shit phone

CS-2:     What, what's going on

GIBBARD:   We ready to rock and roll tomorrow or what honey?

CS-2:     Umm, yeah I think so.  It's just, I don't want you to go grab it on the account of me, but you know, I think, I think, I, until I get the guarantee, but I think so.

GIBBARD:   Alright, so I'm going to go grab it anyway, but I would, hopefully, hopefully it's for you.

CS-2:     Yeah, yeah, yeah, easy.

GIBBARD:   Just so I don't have to run around, you know what I'm saying; it's going to be one, two, three.

CS-2:     What would be available the entire 3 or less?

GIBBARD:   Yeah, the entire three.

10

35.     CS-2 informed Task Force Officers that GIBBARD was calling CS-2 to inquire if CS-1 was prepared to purchase additional pills the following day. CS-2 informed Task Force Officers that GIBBARD's statement "Yeah, entire three" refers to 3,000 pills being available for purchase. The call continues:

CS-2:       Alright, so, so then grab it. Do what you got to do, if there's people along the way, you know, you got to see, just do it and just give me a heads up and then I'll try to make everything happen tomorrow.

GIBBARD:    Well, check this out, look, I'm going to grab it right? I'm going to grab it and then um... I'm not going to make a move until I hear from you tomorrow and if you say you want it, it's all yours. If you say you don't want it, if you say you don't want it, then I'll start making phone calls that's all.

CS-2:       Alright, good...U/I.

GIBBARD:    Actu.., Actually, ughh, yeah yeah that's all just do that, alright?

CS-2:       Alright, but I'm saying, I don't want you to; I don't want you to just hold on to it and then all of a sudden you...

GIBBARD:    I'm not... U/I

CS:         Yeah, I know, I just, yeah I just don't want to jam you up so.

GIBBARD:    Alight, you're not going to jam me up cause I got to take it anyway. I'm just saying, because I'm getting another three. I'm, I'm, I mean, tomorrows when, Thursday? I'm getting another, three. I'm getting another three Friday.

36.     CS-2 informed Task Force Officers that in this part of the conversation GIBBARD offers the right of first refusal to CS-1 to purchase the pills. If CS-1 declines to

11

purchase the pills GIBBARD will "start making phone calls" to other potential buyers.   The
call continues:

| | |
|---|---|
| CS-2: | So this guy's rocking and rolling right now...good. |
| GIBBARD: | Tomorrow, so let's go, let's go, pick with the pace nigga, lets go. |
| CS-2: | (laughing)… alright, I just, I just have a lot of thing I got to do tomorrow in the day but uggh,  one hundred percent  I will get in touch with you and speak to this guy. |
| GIBBARD: | Call this kid |
| CS-2: | Yup |
| GIBBARD: | Well, tell, tell this guy, like, he's really, really, were really ready to rock and roll. |
| CS-2: | Yup, you got it. I definitely will because I definitely, ugh, I need to do. I just, its just a matter of... ok... I'm all in.  I'll get back in touch with you later. |

37.    CS-2 informed Task Force Officers that his/her statement "So this
guy's rocking and rolling right now...good" refers to GIBBARD's supplier, known to Task
Force Officers as ANTHONY DALBA and his ability to press large volumes of pills.  CS-2
also informed Task Force Officers that GIBBARD's reference to "this kid" refers to CS-1.
The call continues:

| | |
|---|---|
| GIBBARD: | I mean if you really want to start killing it, I'll drop it a little bit too. |
| CS-2: | What?  The number? |
| GIBBARD: | Yup |
| CS-2: | To what? |

12

GIBBARD:   If you really want to start killing it, I'll do another thirty thousand.

CS-2:   Alright, well, let's get consistent; this...this... is the first or second time, so let's see how consistent this is going to be.  If it's just, you know what I mean?  Cause...

      38.   CS-2 informed Task Force Officers that GIBBARD's statement "I mean if you really want to start killing it, I'll drop it a little bit too," is a reference to CS-1 potentially purchasing larger amounts of pills for a reduced price.  The call continues:

GIBBARD:   U/I....listen, listen, bro, once you have this, everything else falls to the wayside.

CS-2:   Yeah

GIBBARD:   This shit is U/I.  A...nothing else is worth the time or the effort; you know what I'm saying?  B...the only, the only reason you just keep it; you just buy the other stuff just to have it.

CS-2:   Yeah I hear you, but you know...Alright, yeah I know but, I, I just like, fifty cents my only profit is just, U/I

GIBBARD:   Well, you're talking, fifty cents on five is what...$2,500.

CS-2:   That's correct

GIBBARD:   Okay you're really; you want to do for forty thousand?

CS-2:   No, no, no, no, no, yeah I hear you.  There's nothing wrong with it. I'm on it.  I like it.

GIBBARD:   Yo listen, do, do twenty thousand, give me an order of thirty thousand then we'll really be talking.

CS-2:   (laughing) ....holy shit

13

GIBBARD:    I'm serious, give me, give me, give me an order of one hundred thousand, you'll get a cut of, you know what I'm saying, three of four dollars.

CS-2:       And how the hell, how the hell would you be able , how the hell would he be able handle that a little bit at a time?  (laughing)

GIBBARD:    What do you mean?

CS-2:       Like he wouldn't be able to do that, fucking, like a couple, like one or two shots.

GIBBARD:    One, one shot

GIBBARD:    If he, he, really wanted to do it, one shot

CS-2:       Wow that's scary…(laughing)

GIBBARD:    What?

GIBBARD:    I said that's scary.  I'm just not used to hearing any number like that in my life, you know?

GIBBARD:    U/I…listen, hold on, hold on.

CS-2:       Yeah

     39.    CS-2 informed Task Force Officers that in this portion of the conversation GIBBARD is explaining to CS-2 that his supplier has the ability to press up to 100,000 pills in a short period of time.  GIBBARD also states that a large order of 100,000 pills would result in a "cut" in price of "three or four dollars" per pill.  The call continues:

GIBBARD:    Hold on, Let me explain something to you.  You get three U/I, you get, are you listening to me right now?

14

CS-2:          yeah I hear you, I just got to go, but go ahead.

GIBBARD:    Bro, you get out of one fucking U/I, out of half of brick U/I, fucking five hundred U/I of pills. So it's very easy, it's not that hard, like, U/I, ten pills out of, you get ten pills out of a gram

CS-2:          Yeah

GIBBARD:    (laughing) you know what I'm saying? or more. No, you get fucking, no you get ten grams out of a pill and then you get one hundred pills out of a gram.

CS-2:           a hundred pills out of a gram

GIBBARD:    You get one hundred pills out of a gram, dude. So, why U/I...

CS-2:          Yeah

GIBBARD:    U/I, we get a hundred, so you know what I'm saying, that's we need to start doing because one, one, one, one brick, one brick makes you a million dollars. We want to get U/I, this kids got like fucking five bricks. (Laughing) that's fucking, that's 600 million, that's fucking, that's, six million pills.

       40.    CS-2 informed Task Force Officers that in this portion of the call GIBBARD explains to CS-2 the ratio of how many pills can be pressed from a "brick," of acetyl fentanyl. CS-2 informed Task Force Officers that a "brick" is slang for a kilogram of packaged narcotics. The call continues:

CS-2:          Now U/I, is he adding the color to it or is it coming to him?

GIBBARD:    Yeah

CS-2:          So, so he's adding the color?

GIBBARD:    Yeah

15

CS-2:       Okay, okay.  Alright, alright, say no more.

GIBBARD:    Alright.

CS-2:       Well uggh, uggh, alright so you're going, you're going to get it tonight or tomorrow day, I'm just curious to know when

GIBBARD:    U/I….in the morning

CS-2:       Wait, say it again I can't hear you.

GIBBARD:    It will be here in the morning, so, just, call me, you know what I'm saying, find out if you get it tonight, if you want, want it, just, just try to line it up that's all.

CS-2:        okay, you got it Pal.  I will talk to you soon.

GIBBARD:     Alright bye,

CS-2:        alright, bye bye

      41.    On October 26, 2015, CS-2 called GIBBARD on the First Burner Phone to inquire about purchasing more pills on behalf of CS-1.  The call was consensually recorded by CS-2.  The call proceeded as follows:

GIBBARD:    Hello

CS-2:       U/I what's going on?

GIBBARD:    Hello?  What's going on?  What's the deal?

CS-2:       Oh yeah, ugh, I'll probably see you in the middle of the week

GIBBARD:    Alright, know when? [U/I], yeah, when, when?

CS-2:       What?

GIBBARD:    When did, when?

CS-2:    I said, I don't know Wednesday, Thursday, something like that.

GIBBARD:    Alright yeah, I just got to get ready that's all

CS-2:    Yeah, I just ugh, It will probably be ugh, I'm hoping it will be like two thousand but just, definitely have a thousand, it will be at least that. Alright?

GIBBARD:    Yeah, I just got to get, I just got to get ready

CS-2:    Yeah, yeah, yeah, so you just let me know. Just, just figure, definitely a thousand plus you know, those ones that you owe me, we'll work that out. So, like eleven hundred or whatever, or eleven hundred thirty or I'll just take the money out of that one and then by that time if he wants more then I'll let you know, but it will at least be a thousand.

GIBBARD:    Alright, sounds good

CS-2:    Alright man, I'll talk to you later

GIBBARD:    Alright

CS-2:     Bye bye

GIBBARD:    Alright cool

42.    CS-2 informed Task Force Officers that GIBBARD's statement "Yeah, I just got to get, I just got to get ready," refers to resupplying his stock of pills with his supplier, known to Task Force Officers as ANTHONY DALBA.

43.    On November 3, 2015, GIBBARD used the First Burner Phone to call CS-2 to inform him/her that he could provide additional pills for purchase. That same day, at

17

the direction of Task Force Officers, CS-2 made a consensually recorded telephone call to GIBBARD and agreed to the purchase.

44.    On November 3, 2015, prior to arriving at GIBBARD's residence, Task Force Officers equipped CS-2 with an audio/video recording device. At the meeting, GIBBARD provided CS-2 with 1,000 pills in exchange for $6500.00 of funds supplied to CS-2 by the DEA.

45.    On or about November 5, 2015, the investigation revealed that ANTHONY DALBA had ceased payment on cellular telephone number (929) 247-7890.

46.    On November 12, 2015, the Honorable William F. Kuntz, District Court Judge for the Eastern District of New York, authorized the interception of electronic communications over the First Burner Phone. The government monitored the First Burner Phone for a period of 15 days but was unsuccessful in intercepting any calls.

47.    Shortly thereafter, CS-2 informed Task Force Officers that GIBBARD had discarded the First Burner Phone and had recently purchased another burner phone (the "Second Burner Phone") . CS-2 subsequently provided Task Force Officers the telephone number for the Second Burner Phone.

48.    On November 30, 2015, the government ceased intercepting communications on the First Burner Phone and sealed the wire.

18

II.  The SUBJECT TELEPHONE Is Being Used in Furtherance of the Narcotics
     Trafficking Conspiracy

49.  On or about November 23, 2015, GIBBARD called CS-2 on the

Second Burner Phone and informed CS-2 that pills had become available for CS-1 to

purchase. As with the previous controlled buys, GIBBARD would only conduct the

transaction using CS-2 as an intermediary.

50.  Between November 30, 2015 and December 1, 2015, GIBBARD called

CS-2 multiple times per day requesting that CS-2 purchase pills. GIBBARD informed CS-2

that he owed money to his supplier, known to Task Force Officers as ANTHONY DALBA,

for a previous batch of pills.

51.  On December 1, 2015, GIBBARD called CS-2 on the Second Burner

Phone. The call was consensually recorded by CS-2. Task Force Officers confirmed

through the Callyo recording system that the telephone number matched the burner phone

being used by GIBBARD. The conversation proceeded as follows:

CS-2:      Hello

GIBBARD:   Yo, What's goin on?

CS-2:      I'm workin on it.

GIBBARD:   Come on man, it's fuckin six o'clock, 5:30 already.

CS-2:      I got two issues, here's the problem, this is the issue (A), I don't
           wanna lay money out for it, any money (B), I don't wanna go to my
           house with those fuckin pills, period. My wife, the baby.

GIBBARD:   I totally understand that. How about this, lay out the money and I'll
           bring, I'll put it in my place right now for you, by the time they close,
           they close at 7. It will be at my place, I'll give you the key too. You

19

know what I'm saying you can go there tomorrow, whatever time you want. It's right in my neighborhood, you know, you know the kid who runs the place too so it's even better. I'll go put them in there right now for you and have them, and you can go there anytime there anytime you want tomorrow, I'll give you the key, come here and get the key, you can go anytime you want.

CS-2:       I can't believe you're putting so much fucking pressure on me right now, it's crazy.

GIBBARD:   He's calling me again bro, he don't fuckin stop bro, he's annoying and he's, he's a spiteful fuck. If I don't have his money, he's gonna fuck [call goes silent due to incoming call] he's a spiteful mother fucker.

CS-2:       Well, what if you just give it back to him?

GIBBARD:   [Laughs] That's even worse, then he'll never [calls goes silent due to incoming call] bro are you really this fuckin Jewish bro? All the [call goes silent due to incoming call] bro. If [CS-1] told you to do it, you'd be fuckin sucking his dick and climbing his back, scratching his back. Bro, all the shit I did for you, did this for you bro.

CS-2:       [makes moaning noise ]

GIBBARD:   I know, but you.

CS-2:       I was ready a month ago.

GIBBARD:   Bro you told me you snorted them. You told me last weed you'd be ready Tuesday, you told me, Come on bro. Give me a fuckin break, just to go see him, and that's it, you're up, fuck, you're half, you're, you're fuckin up half, you're only paying me for half.   What's the problem? You're up. Nobody is listening. You want me to call him on three way? Huh? I'm gonna call him on three way.

           [Both speaking over each other.]

GIBBARD:   Don't say nothing, I'm calling him on three-way. Okay?

CS-2:        I'm not gonna say a word

GIBBARD:   Alright, so you can hear, just so you can hear him fucking flip out. Ready?

20

CS-2:       Okay

GIBBARD:   Watch this, don't say a fuckin word. Alright?

CS-2:       I won't say a word.

GIBBARD:   ready

CS-2:       Uh

52.   CS-2 informed Task Force Officers that the individual GIBBARD owes money to his supplier, known to Task Force Officers as ANTHONY DALBA.  Toll records between November 29, 2015 and December 7, 2015 reveal that GIBBARD has dialed cellular telephone number (347) 209-3108 from the Second Burner Phone approximately 100 times.   Toll records for (347) 209-3108 reveal that the Second Burner Phone called (347) 209-3108 at the precise time GIBBARD initiated the three-way call with CS-2.  Accordingly, Task Force Officers have probable cause to believe that cellular number (347) 209-3108 is DALBA's new burner phone.

53.   CS-2 informed Task Force Officers that GIBBARD owes money to DALBA in part because CS-2 has not conducted additional pill purchases with GIBBARD. CS-2 informs Task Force Officers that GIBBARD wanted to prove to CS-2 that DALBA is upset that he has not received his money. Thus, GIBBARD instructs CS-2 to be silent as he dials in DALBA on a three-way connection.  The call continues:

********GIBBARD CALLS DALBA USING THREE-WAY CONNECTION********

DALBA:      [Answers phone singing]  Silent morning, I wake up and you're not there, I wake up by myself

21

GIBBARD:   What are you doing? Are you gonna fucking break my balls bro?

DALBA:   Again, hold up [child making noise in the background]

GIBBARD:   You there?

DALBA:   Yeah, I'm here. What's up?

GIBBARD:   What?

DALBA:   Are you ready to go?

GIBBARD:   He's coming, he's coming, he said he's gonna be coming any minute, like in the next hour

DALBA:   Alright, I can't do anything until after 9, I got my boy here, alright?

GIBBARD:   Oh, so that gives me even more time, good.  You're not gonna be a fucking dick like you were yesterday, being a jerk off.

DALBA:   Dude, you gonna say, you tell me one thing, and then it doesn't happen, so what do you want me to do? I need you to be fucking upfront dude, you know what I'm saying?  I got bills to pay.

GIBBARD:   Bro, I'm the one who [mumbles] when you, you , you, listen, you haven't given me nothing in fucking two months.  The minute I fucking get something, it's like I gotta off them in two, in two seconds.  Yes the kid promised me.

DALBA:   Maybe you shouldn't of took more than you could chew then bro.

GIBBARD:   But the kid told me, he, bit more off than I could chew? I'm the one that fucking did all this shit, started all this shit.

DALBA:   Listen to me, I don't care who started whatever dude. I just need what you owe me, I need it. I need it. I gotta pay somebody.  I owe people money.

GIBBARD:   And what do you got [mumbles]

DALBA:   You know what I'm saying? I can't wait fucking two or three days for my thing, I can't wait for money like that.

GIBBARD:    The kid promised me he'd be here fucking yesterday he said, he promised me.

DALBA:      Alright, I'll call you at nine o'clock when I get, when I get my son over and maybe we'll go to, I want to go to gyro corner to eat.

GIBBARD:    I don't want you screaming at me fuckin every two seconds.

DALBA:      I won't.

GIBBARD:    you gonna, you gonna call me in an hour?

DALBA:      I'll call you at nine, I'll call you at nine [child talking in the background].

GIBBARD:    alright.

54.     CS-2 informed Task Force Officers that GIBBARD's statement "the minute I fucking get something, it's like I gotta off them in two, in two seconds" refers to the small time interval between selling the pills supplied by ANTHONY DALBA and the time DALBA expects to receive the proceeds from that sale. CS-2 also informed Task Force Officers that GIBBARD's reference to "the kid" refers to CS-2.

55.     On December 2, 2015, GIBBARD used the Second Burner Phone to call CS-2 in order to request that CS-2 make an additional pill purchase. That same day, at the direction of Task Force Officers, CS-2 made a consensually recorded telephone call to GIBBARD and agreed to the purchase.

56.     Prior to arriving at GIBBARD's residence, Task Force Officers equipped CS-2 with an audio/video recording device. At the meeting, GIBBARD provided CS-2 with 404 pills in exchange for $2,200.00 of funds supplied to CS-2 by the DEA.

## Authorization Request

57.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). I further request that the Court issue an Order pursuant to 18 U.S.C. §§ 3122 and 3123, authorizing for a period of 60 days the installation and use of a pen register and a trap and trace device on the SUBJECT TELPEPHONE.

58.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user(s) of the SUBJECT TELEPHONE would seriously jeopardize the ongoing investigation, as such disclosure would permit the target subjects to flee from and evade prosecution.  Moreover, to the extent that the warrant authorizes the seizure of any tangible property, any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

59.     I further request that the Court direct the Service Provider to disclose to the government any information described in Attachment B that is within the Service Provider's possession, custody, or control.  I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance

necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, by, inter alia, initiating a signal to determine the locations of the SUBJECT TELEPHONE on the Service Provider's networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

60.      I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONE outside of daytime hours.

61.      I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation. Disclosure of this application and these orders would seriously jeopardize the ongoing investigation, as such a disclosure would give the target subjects an opportunity to continue to flee from or evade prosecution.

62.    IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, the Court issue an Order commanding the Service Provider not to notify any person (including the subscriber or customer of the account listed in the attached warrant) of the existence of the attached warrant until further order of the Court.

Dated:      Brooklyn, New York
            December 18, 2015

                              _____
                              Gino X. Izzo
                              Task Force Officer
                              Drug Enforcement Administration

Sworn to before me the 18th day of December, 2015

     s/Robert Levy
_____
THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property To Be Searched

1.      The cellular telephone assigned call number (347) 209-3108 (the "SUBJECT TELEPHONE"), whose wireless service provider is T-Mobile USA, Inc., a company headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.

2.      Information about the location of the SUBJECT TELEPHONE that is within the possession, custody, or control of T-Mobile USA, Inc., including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the SUBJECT TELEPHONE described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the SUBJECT TELEPHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK **15 MISC 2539**
- - - - - - - - - - - - - - - - - - - - - - - - - x    TO BE FILED UNDER SEAL
IN RE APPLICATION OF THE UNITED    :
STATES OF AMERICA FOR AN ORDER :    ORDER
PURSUANT TO 18 U.S.C. § 2705(b)    :
- - - - - - - - - - - - - - - - - - - - - - - - x

Application having been made for a search warrant under Federal Rule of

Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of

the cellular telephone assigned call number (347) 209-3108 (the "SUBJECT TELPHONE"),

and an application made pursuant to 18 U.S.C. §§ 3122 and 3123, authorizing for a period of

60 days the installation and use of a pen register and a trap and trace device on the SUBJECT

TELEPHONE, whose wireless telephone service provider is T-Mobile USA, Inc. (the

"Service Provider"), as further described in Attachment B to the search warrant (the

"Requested Information");

The Court finds that there is reasonable cause to believe that providing

immediate notification of the execution of the warrant may seriously jeopardize an ongoing

investigation, including by giving the target an opportunity to flee or continue flight from

prosecution. See 18 U.S.C. §§ 2705(b)(2), 2705(b)(3) and 2705(b)(5). Furthermore, the

execution of this warrant will not result in the seizure of any tangible property or any wire or

electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant

authorizes the seizure of any stored wire or electronic information, that seizure is expressly

authorized by 18 U.S.C. § 2703(c)(1)(A).

IT IS HEREBY ORDERED pursuant to Federal Rule of Criminal Procedure

41 and 18 U.S.C. § 2703(c)(1)(A) that law enforcement officers, beginning at any time

within ten days of the date of this Order and for a period not to exceed 30 days, may obtain the Requested Information concerning the SUBJECT TELEPHONE, with said authority to extend to any time of the day or night as required, including when the SUBJECT TELEPHONE leaves the Eastern District of New York; all of said authority being expressly limited to ascertaining the physical location of the SUBJECT TELEPHONE and expressly excluding the contents of any communications conducted by the user(s) of the SUBJECT TELEPHONE.

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 3123, that special agents of the investigative agency may install, or cause to be installed, and use a pen register to record or decode dialing, routing, addressing, or signaling information transmitted from the SUBJECT TELEPHONE — excluding the decoding of post-cut-through dialed digits ("PCTDD")[2] — to record the date and time of such dialings or transmissions, and to record the length of time the telephone receiver in question is "off the hook" for incoming or outgoing calls for a period 60 days, beginning at any time within 14 days from the date of this Order, and that the tracing operations be without geographical limits.

---

[2]     PCTDD "are digits that are dialed from a telephone after a call is connected or 'cut-through.'" In re Application, 632 F. Supp. 2d 202, 203 n.1 (E.D.N.Y. 2008). Pursuant to the proposed Order to Service Provider, if possible, the provider will forward only pre-cut-through-dialed digits to the investigative agency. If the provider's technical capabilities require it to forward all dialed digits including PCTDD, however, the investigative agency will only decode and forward to the assigned special agents the numbers that are dialed before the call is cut through. Thus no PCTDD will be decoded or accessed by anyone. See id. at 204 n.3 ("It is irrelevant that the provider will forward PCTDD to the Government and that the Government will therefore be able, if it violates the court order, to record and decode it.").

IT IS FURTHER ORDERED that this authorization for the installation and use of a pen register and a trap and trace device applies not only to the telephone number listed above for the SUBJECT TELEPHONE, but also to any changed telephone number assigned to an instrument bearing the same IMSI or IMEI as the SUBJECT TELEPHONE, or any changed IMSI or IMEI subsequently assigned to the same telephone number as the SUBJECT TELEPHONE, or any additional changed telephone number and/or IMSI or IMEI, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the SUBJECT TELEPHONE within the 60-day period authorized by this Order.

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 3123(a)(1) and (b)(2), and 18 U.S.C. § 2703(c) and (d), that upon service of this Order upon it, the service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of the Order shall furnish special agents of the investigative agency forthwith all information, including but not limited to telephone subscriber information, facilities, and technical assistance necessary to accomplish the installation and use of the pen register and trap and trace device unobtrusively and with minimum interference.

It is further ORDERED that the Service Provider assist law enforcement by providing all information, facilities and technical assistance needed to ascertain the Requested Information, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and furnish the technical assistance necessary

to accomplish the acquisition unobtrusively and with a minimum of interference with such services as the service provider accords the user(s) of the SUBJECT TELEPHONE.

It is further ORDERED that the United States Attorney's Office compensate the service provider for reasonable expenses incurred in complying with any such request.

It is further ORDERED that the Court's Order and the accompanying Affidavit submitted in support thereof be sealed until further Order of the Court, except that copies of the Court's Order in full or redacted form may be maintained by the United States Attorney's Office, and may be served on law enforcement officers, and other government and contract personnel acting under the supervision of such law enforcement officers, and the service provider as necessary to effectuate the Court's Order.

It is further ORDERED that this warrant be returned to the issuing judicial officer within 14 days after the termination of the monitoring period authorized by the warrant.

It is further ORDERED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), service of notice may be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extension thereof.

It is further ORDERED under 18 U.S.C. § 2705(b) that the Service Provider shall not disclose the existence of the attached warrant, or this Order of the Court, to the listed subscriber or to any other person, unless and until otherwise authorized to do so by the

Court, except that Service Provider may disclose the attached warrant to an attorney for the

Service Provider for the purpose of receiving legal advice.


Dated:          Brooklyn, New York
                December 18, 2015

                                   s/Robert Levy
                        _____
                        THE HONORABLE ROBERT M. LEVY
                        UNITED STATES MAGISTRATE JUDGE
                        EASTERN DISTRICT OF NEW YORK